A10A2308. ANIEBUE v. JAGUAR CREDIT CORPORATION.
(708 SE2d 4)

ADAMS, Judge.

Chukwuemeka A. Aniebue, pro se, appeals the trial court's grant of summary judgment to Jaguar Credit Corporation ("JCC") in the company's suit to recover the deficiency on an automobile lease.

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law. OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). This Court applies a de novo review to a grant of summary judgment, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *Versey v. Citizens Trust Bank*, 306 Ga. App. 479 (702 SE2d 479) (2010).

So viewed, the evidence shows that on September 10, 2007, Chukwuemeka A. Aniebue ("Aniebue") and his wife, Alma Aniebue, signed a Motor Vehicle Lease Agreement with Hennessey Jaguar of Gwinnett.[1] Under this Agreement, the Aniebues entered into a four-year monthly payment lease for a 2008 Jaguar, which required

---

[1] JCC filed suit against both Chukwuemeka Aniebue and his wife Alma, but Chukwuemeka is the only appellant before this Court. The Aniebues represented themselves pro se in the trial court. After the court entered a default judgment against Alma for failure to file a timely answer, she filed a motion to set aside the default, which the trial court denied. Alma filed a second motion to set aside on June 8, 2010, the same day Chukwuemeka filed the notice of appeal in this case. Although the notice indicates that "Defendants" were appealing the trial court's "final judgment," the notice was signed only by Chukwuemeka. Alma Aniebue

them to make a $999.27 payment each month. At the end of the lease, the Aniebues had the option of purchasing the car for the stated "residual value" of $19,684.

The Agreement further provided that the Aniebues could voluntarily terminate the lease by returning the vehicle. But if they chose to terminate, they were required to pay the difference between the unpaid portion of Adjusted Capitalized Cost, which the lease calculated at $59,145, and the vehicle's fair market wholesale price, in addition to any other costs due and owing under the lease. In the event of a default, JCC was entitled to a return of the vehicle, and the Aniebues were required to pay the difference between the Adjusted Capitalized Cost and "the value that could be realized at the wholesale sale of the Vehicle," as well as any other costs due and owing.

JCC purchased the lease from Hennessey Jaguar in the ordinary course of business and serviced the Aniebues' account. JCC's account records indicate that the Aniebues made regular monthly payments of $1,000 to $1,010 for the first four months of the lease, from October 2007 to January 2008, but made no payments in February or March 2008. The Aniebues then resumed payments in varying amounts from April through June 2008, including payments of only $500 for two of those months. Although no payment is recorded for either July or September 2008, the Aniebues made two $1,000 payments in August.

On October 8, 2008, the Aniebues voluntarily surrendered the car to JCC. Aniebue denies that he made the surrender because the lease was in default, despite the fact that JCC records indicate that the lease was not current at that time.[2] Rather, Aniebue states that he initiated the surrender primarily because the automobile had "developed major technical problems ranging from bad seat belt, noisy brakes, and occasional lock-engine." At the time of surrender, Aniebue signed a voluntary surrender form, which reflects that the balance remaining under the lease was $52,496.09. By signing the form, Aniebue agreed that the car could be sold and if the sale price did not cover the balance due plus sale expenses, he agreed to pay

never filed a notice of appeal, and Chukwuemeka, a non-attorney, could not file an appeal on her behalf. Thus, Alma Aniebue is not a party to this appeal, and we will not consider Chukwuemeka's enumeration regarding the default judgment entered against Alma because he has no standing to appeal that ruling. See *Stonica v. State Farm Fire &c. Co.*, 198 Ga. App. 717 (402 SE2d 553) (1991).

[2] JCC records do not reflect that the Aniebues ever reimbursed JCC for at least three months of skipped payments or made up the two half-payments in April and May, and Aniebue produced no evidence of any further payments. Although the account records show a $1,000 payment in October 2008 at the time of surrender, a subsequent entry appears to indicate that this payment may have been reversed.

JCC the difference. The form also provided that Aniebue was not "waiving his right to redeem the property or to be advised of any proposed sale of the property before it is sold."

JCC sold the car at auction for $29,600 in January 2009. Aniebue states that he received no prior notice of this sale, and JCC has provided no proof of such notice. JCC applied the sales proceeds to the balance due on the account, which the company had adjusted downward from the balance shown on the voluntary surrender form to $48,591.29,[3] leaving a balance of $18,991.29. The company then added charges in the amount of $5,248.17, reflecting repossession expense, maintenance fee, lease extension fee, late charges and service charges, resulting in a total of $24,239.46. JCC initiated this action to collect this amount plus interest and attorney fees, and the trial court subsequently granted summary judgment in its favor against Aniebue.

1. Aniebue argues that the trial court erred in granting JCC's motion for summary judgment because JCC failed to provide him notice as required under OCGA §§ 10-1-36 and 11-9-611 (b).[4] The applicability of these sections, however, "depends on whether the contract denominated a lease by the parties is a true lease or is a disguised secured transaction. If the lease is not a security transaction the notice provisions are inapplicable, and the [post-surrender] sale was properly conducted." (Citation and punctuation omitted.) *Mejia v. C & S Bank*, 175 Ga. App. 80, 81 (332 SE2d 170) (1985).

Under Georgia's version of the UCC, "[w]hether a transaction creates a lease or security interest is determined by the facts of each case." OCGA § 11-1-201 (37). That statute "defines the distinction between a 'true lease' and a security interest in an agreement involving . . . a purchase option [by] focusing the inquiry on the economics of the transaction, not the intent of the parties." (Citation and punctuation omitted.) *Coleman v. DaimlerChrysler Svcs. of North America*, 276 Ga. App. 336, 337 (623 SE2d 189) (2005). Accordingly, under OCGA § 11-1-201 (37),

> a transaction creates a security interest if [1] the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and . . . [2] [t]he lessee has an option to become the owner of the

---

[3] The account documentation reflects that this reduction was due to a rebate credit on the account.

[4] Although Aniebue also asserts violations of OCGA §§ 44-14-161, 44-14-162, and 44-14-162.1, those statutes address the sale of real estate on foreclosure and have no application in this case.

goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

OCGA § 11-1-201 (37). This two-pronged analysis has been termed the "Bright-Line Test" for determining whether a security interest exists. *Coleman*, 276 Ga. App. at 238. In addition, the statute provides that

> [a] transaction does not create a security interest merely because it provides that . . . [t]he lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

Id. Accordingly, we have recognized that "[t]here is a set of purchase options whose fixed price is less than fair market value but greater than nominal that must be determined on the facts of each case to ascertain whether the transaction in which the option is included creates a lease or a security interest." Id. Thus, regardless of whether other provisions of the Agreement are

> indicative of a security agreement, it is commonly held that "the best test" for determining the intent of an agreement which provides for an option to buy, is a comparison of the option price with the market value of the equipment at the time the option is to be exercised. Such a comparison shows whether the lessee is paying actual value or acquiring the property at a substantially lower price.

(Citation and punctuation omitted.) *Mejia v. C & S Bank*, 175 Ga. App. at 81.

The Agreement here sets the end-of-lease purchase option price for the vehicle, which it denominates the "residual value," at $19,684, but it does not expressly state that this figure represents the estimated fair market value as of September 2011, the time the purchase option could be exercised. And JCC failed to provide the trial court with information regarding such value. Without this information, we cannot apply the "best test" for determining whether the Agreement creates a security interest. However, the use of the term "residual value" suggests the parties were attempting to value the car at lease end. And the record demonstrates that the $19,684 purchase option price is approximately one-third of the car's value in September 2007 as agreed upon by the parties at the beginning of the lease and approximately two-thirds of the sale price netted at the wholesale auction in January 2009. Accordingly, even if

the option price were less than the fair market value as of September 2011, we conclude that it cannot be deemed a merely nominal amount.

Moreover, application of the Bright-Line Test under OCGA § 11-1-201 (37) "does not necessarily end the analysis." *Coleman v. DaimlerChrysler Svcs.*, 276 Ga. App. at 339. Rather, we have recognized that

> the key issue the Court must determine is whether the lessor retains a meaningful residual interest at the end of the lease term. If there is a meaningful reversionary interest ... the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security agreement, not a lease.

(Citations and punctuation omitted.) Id. Courts across the country have applied various tests in determining whether the lessor retained a meaningful reversionary interest under the UCC. We conclude that the test employed in *In re QDS Components*, 292 BR 313, 342 (S.D. Ohio 2002),[5] is appropriate for application in this case. That test analyzes two factors: "(1) whether the purchase option price is nominal; and (2) whether the agreement contains any provision for the lessee's acquisition of equity in the vehicle." (Citation omitted.) *In re QDS Components*, 292 BR at 342. We have already concluded that the option price must be considered more than nominal, and a review of the Agreement shows no provision purporting to grant the Aniebues' equity in the vehicle prior to exercise of the purchase option. Thus, we conclude that JCC retained a meaningful reversionary interest in the car.

Under these circumstances, we find that the lease agreement entered into by the parties was intended to be a true lease and not to evince a secured transaction. Accordingly, JCC was not required to comply with the notice provisions of OCGA §§ 10-1-36 and 11-9-611 (b), and the trial court did not err on this ground in granting summary judgment in favor of JCC and against Aniebue.

2. Aniebue also contends that the trial court erred in awarding JCC the principal balance of $24,239.46, because the company provided no backup documentation or explanation to support its damage calculations, particularly the maintenance, repossession, service and other charges. In his discovery responses and pleadings, Aniebue disputed the amount JCC claimed was due under the

---

[5] We have previously recognized the *QDS Components* case as authority on these UCC provisions. *Coleman*, 276 Ga. App. at 338.

Agreement[6] and asked that JCC explain its calculations, although he apparently never served any discovery of his own.

Nevertheless, on summary judgment, the movant bears the burden of showing that no issue of fact remains as to any material fact of his claim. *Edmonds v. Bd. of Regents &c. of Ga.,* 302 Ga. App. 1, 2 (689 SE2d 352) (2009). JCC therefore bore the burden of establishing the amount of Aniebue's debt in order to prove that no material fact remains as to damages. In that regard, JCC presented an affidavit from Beverly Villanueva, an account representative familiar with the Aniebues' JCC account. Villanueva addresses at least one of these fees in her affidavit, stating that "the expenses incurred by [JCC] for the resale of the vehicle amounted to $400, as shown by Exhibits [sic] 'E.'" But Exhibit "E" shows only $225 in sale costs: $95 for "reconditioning" the car and $130 in sales fees charged by the auction company. No explanation is given for this discrepancy. Additionally, JCC's attorney prepared a calculation of damages, which was attached as an exhibit to Villanueva's affidavit. That exhibit lists a "repossession expense" of $400, a maintenance fee of $452.23, a lease extension fee of $599.56, late charges of $537.08 and service charges of $3,259.30. Villanueva states that the attorney's exhibit "accurately reflects the calculation of principal balance due. After applying the resale proceeds to the balance due plus other debits or credits required or authorized by the terms of the contract, [Aniebue] still owes the principal sum of $24,239.46." Villanueva, however, does not explain the basis of these fees, which added an additional 28 percent to Aniebue's account balance after resale, nor does she point to any supporting documentation. And neither Villanueva's affidavit, nor JCC's briefing identifies the provision of the Agreement requiring Aniebue to pay these additional charges.

Thus, the only specific document Villanueva cites in support of any of the fees reflects a figure lower than the amount stated in the affidavit. To the extent that other supporting documents exist to explain this discrepancy, they were not attached as part of the noted Exhibit.[7] "Business records, when appropriate, must accompany an affidavit purporting to establish the amount of a debt. When records

---

[6] For example, Aniebue questions why JCC is attempting to charge him over $3,000 in service charges when the lease reflects that the car was under a standard manufacturer's warranty and the car's odometer reflected only 12,981 miles at the time of resale. No explanation appears in the record as to whether the service charge refers to service on the vehicle, service on the account or some other matter.

[7] Although the printout of the account attached as a separate exhibit reflects various rebates, credits, fees and assessments, those items are designated by codes or abbreviated descriptions, making it difficult to identify these account adjustments or to relate them to the fees sought as damages by JCC.

relied upon and referred to in an affidavit are neither attached to the affidavit nor included in the record, the affidavit is insufficient." (Citations omitted.) *OVIP, Inc. v. Blockbuster Textiles*, 289 Ga. App. 276, 279-280 (2) (656 SE2d 907) (2008). See also *Powers v. Hudson & Keyse*, 289 Ga. App. 251, 252 (1) (656 SE2d 578) (2008). And to the extent that Villanueva relied upon the attorney's summary exhibit in determining the amount of Aniebue's indebtedness, such reliance would be inadequate to establish damages. See *Gateway Leasing Corp. v. Heath*, 168 Ga. App. 858, 859-860 (1) (310 SE2d 549) (1983).

We conclude, therefore, that JCC failed to carry its burden of showing that there is no genuine issue of material fact as to the amount of Aniebue's indebtedness under the Agreement. Accordingly, the trial court erred in awarding the principal amount of $24,239.46 on summary judgment.

3. Aniebue further asserts that the trial court erred in failing to hold an evidentiary hearing to determine damages, but the record shows that neither party requested a hearing on JCC's motion for summary judgment. In the absence of such a request, it was not error for the trial court to rule on the motion for summary judgment without a hearing. Uniform Superior Court Rule 6.3; *Southern Intl. Pictures v. Friedman*, 201 Ga. App. 87 (1) (410 SE2d 51) (1991).

*Judgment affirmed in part and reversed in part. Smith, P. J., and Mikell, J., concur.*

DECIDED FEBRUARY 16, 2011.

Chukwuemeka A. Aniebue, *pro se.*
*Bridgers, Peters & Kleber, Jerry C. Tootle*, for appellee.